IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

TREVELLE J. TAYLOR,

                          Petitioner,                          **4:19CV3102**

          vs.

SCOTT FRAKES, NDCS Director;                          **MEMORANDUM AND ORDER**

                          Respondent.

This matter is before the court on Trevelle J. Taylor's ("Petitioner" or "Taylor") Petition for Writ of Habeas Corpus. (Filing 1.) For the reasons that follow, Petitioner's habeas petition is denied and dismissed with prejudice.

## I. CLAIMS

Summarized and condensed,[1] and as set forth in the court's initial review order (filing 6), Taylor asserted the following claims that were potentially cognizable in this court:

Claim One:     Petitioner received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments when counsel failed to raise Fourth Amendment objections to evidence and testimony obtained from an unconstitutional detention and arrest to preserve the question of admissibility for appeal.

---

[1] Petitioner did not object to the court's summary and condensation.

Claim Two:          Petitioner received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments when counsel failed to object to all inadmissible hearsay testimony regarding the general location where the gun used in the homicide was found and failed to raise at trial and on direct appeal the fact that this testimony violated Petitioner's Sixth Amendment right to confrontation.

Claim Three:        Petitioner received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments when counsel failed to object to and move for a mistrial based on the prosecutor's improper closing arguments and failed to assert the issue on direct appeal as plain error.

Claim Four:         Petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the cumulative effect of his counsel's deficient performance resulted in an unfair trial.

Claim Five:         Petitioner's rights under the Fifth and Fourteenth Amendments were violated when the trial court allowed the State to present hearsay testimony by Joseph Copeland about where a gun used in the homicide was located over Petitioner's objections.

Claim Six:          Petitioner's rights under the Fifth and Fourteenth Amendments were violated when the trial court allowed Officer Strominger to make an in-court identification that was the product of an unduly suggestive identification of Petitioner made by Officer Strominger.

2

## II.  BACKGROUND

### A.  Convictions and Sentences

The court states the facts as they were recited by the Nebraska Supreme Court on direct appeal after retrial in *State v. Taylor*, 842 N.W.2d 771, 773 (Neb. 2014) (*Taylor II*) ([filing 8-5](#)). *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

On September 19, 2009, Catrice Bryson was standing outside a friend's house on Curtis Avenue in Omaha, Nebraska, when Gaines pulled into the driveway. Bryson and Gaines spoke for about 10 minutes, during which time Gaines remained seated in his vehicle. At one point during the conversation, Bryson went to her vehicle and reached into the middle console for a pen. When Bryson turned around to rejoin Gaines, she looked toward Curtis Avenue, saw two men with guns, and heard gunshots.

The two men were in the street behind Gaines' vehicle, one on the driver's side and one on the passenger side. The shooter on the driver's side was an African American with a "[l]ow haircut" and wore a brown shirt with orange writing on it. The shooter on the passenger side was a "light-skinned" African American with long braids, a white basketball jersey, and a "do-rag."

Bryson heard Gaines say that he had been shot. She ran toward Gaines' vehicle, screaming for the shooters to stop and to leave Gaines alone. The shooter on the driver's side ran east along Curtis Avenue, and the shooter on the passenger side ran west. Gaines subsequently died from the injuries sustained in the shooting. An autopsy revealed that death was caused by a gunshot wound to the back.

After Omaha police officers arrived on the scene, they broadcast a description of one shooter as an African American male with long braids, a white shirt, and jean

shorts. Police also broadcast a description of a "possible suspect" white vehicle that did not have hubcaps.

As Officer Joel Strominger headed toward the location of the shooting, he saw a vehicle that matched the description of the white vehicle. Near the passenger side, he observed an African American male who was wearing a white T-shirt and dark-colored shorts and had something brown in his hand. Strominger radioed a description of the person to other officers. At trial, Strominger identified Taylor as the person he had seen near the white vehicle.

When the white vehicle went west, and Taylor went east, Strominger followed the vehicle. Once he learned that the vehicle was reported stolen, he pulled it over on 42d Street near Curtis Avenue. Strominger held the lone occupant, Joshua Kercheval, at gunpoint until additional officers arrived to assist with an arrest.

Officer Jarvis Duncan and another officer responded to Strominger's description of the person seen near the white vehicle, and while traveling in the direction Strominger indicated the individual had gone, they saw an African American male matching the description. As they stopped, the man, later identified as Taylor, started running. The officers caught him at Kercheval's house and placed him in handcuffs. Before he was apprehended, Taylor threw a brown shirt under a tree in the front yard of Kercheval's house. At trial, Bryson identified the shirt as the shirt worn by the shooter on the driver's side of Gaines' vehicle.

Duncan placed Taylor in the back seat of a police cruiser and took him to Strominger, who was five or six blocks away. Strominger immediately identified Taylor as the person he had seen by the white vehicle. No more than 10 minutes had elapsed since Strominger had seen Taylor next to the vehicle. Taylor was subsequently charged with first degree murder and use of a deadly weapon to commit a felony. Taylor's first trial resulted in a reversal on appeal for the giving of an erroneous jury instruction. The case was remanded for retrial. *See State v. Taylor*, 803 N.W.2d 746 (Neb. 2011) (*Taylor I*) (filing 8-4).

4

At Taylor's second trial, the State called several witnesses who, on the day of the shooting, had observed Taylor or an individual matching his description near Curtis Avenue. Alisha Hobson and Frances Fortenberry testified that right after they heard gunshots, they saw a man matching Taylor's description running along Curtis Avenue. Trisha Lade saw Taylor running along Vernon Avenue, which is near Curtis Avenue. She saw Taylor kneel behind some bushes and heard him yell into his cell phone, "[C]ome get me." Joseph Copeland testified that just after he heard gunfire, he saw an African American male running along Redick Avenue, which is near Curtis Avenue.

The State also adduced evidence that more than 2 months after the shooting, Copeland's son found a gun hidden in the bushes or trees of a nearby school. The weapon was a semiautomatic 9-mm pistol. Three bullet casings recovered from the scene of the shooting were matched to the pistol.

Kercheval testified that on the day of the shooting, Taylor and Joshua Nolan came to his house; asked if he wanted to ride around in their vehicle, which was white; and then requested that he drive. The three drove around in the vehicle for about 1 hour before stopping at a convenience store from approximately 1:21 to 1:34 p.m. After they left the convenience store, Kercheval let Taylor out of the vehicle at 44th Street and Curtis Avenue so that Taylor could obtain some marijuana and Kercheval parked the vehicle on 45th Street. About 5 minutes later, Nolan exited the vehicle and headed down 45th Street toward Curtis Avenue.

Kercheval testified that about 2 minutes after Nolan left the vehicle, Kercheval heard approximately 10 gunshots and saw Nolan running toward the vehicle from the direction of Curtis Avenue. Kercheval explained that Nolan got into the vehicle, asked Kercheval to "drive off," and then got out of the vehicle at a school near 40th Street and Bauman Avenue. Shortly thereafter, Kercheval was pulled over by a police officer and arrested for driving a stolen vehicle.

5

The jury convicted Taylor of both charges. The district court sentenced him to life imprisonment for first degree murder and 10 years' to 10 years' imprisonment for use of a deadly weapon to commit a felony, to be served consecutively to the life sentence.

## B. Direct Appeal Following Retrial

Taylor appealed his convictions and sentences to the Nebraska Supreme Court. (Filing 8-2.) Taylor was represented on direct appeal by the same counsel who represented him at retrial and sentencing. In his direct appeal, Taylor assigned that the trial court erred in (1) allowing the State to present inadmissible hearsay regarding the location of the gun and (2) allowing Strominger to identify Taylor in court. (Filing 8-5; *see also* Filing 8-7.) Taylor also assigned that his sentence of life imprisonment was unconstitutional. (Filing 8-5; *see also* Filing 8-7 & Filing 8-9.) The Nebraska Supreme Court rejected the first two claims of trial court error and affirmed Taylor's convictions. (Filing 8-5 at CM/ECF pp. 4-7, 8.) The court also affirmed the sentence of imprisonment for 10 to 10 years for use of a weapon to commit a felony, but determined that Taylor's sentence of life imprisonment for first degree murder was unconstitutional under *Miller v. Alabama*, 567 U.S. 460 (2012), because Taylor was under 18 years of age at the time of the offense. (Filing 8-5 at CM/ECF pp. 7-8.) The Nebraska Supreme Court thus vacated the sentence of life imprisonment for first degree murder and remanded the case for resentencing as to that conviction. (Filing 8-5 at CM/ECF pp. 7-8.)

Taylor was resentenced on February 5, 2016, to imprisonment for 40 to 40 years for first degree murder, with the sentence to run consecutively to his sentence for use of a weapon to commit a felony. (*See* Filing 8-16 at CM/ECF p. 38.)

## C. Postconviction Action

On March 30, 2016, Taylor filed a timely pro se motion for postconviction relief. (Filing 8-16 at CM/ECF pp. 2-37.) He set forth three claims of ineffective

6

assistance of trial counsel. He claimed that counsel was ineffective for (1) failing to object to the admission of evidence obtained from an allegedly unconstitutional detention and arrest, (2) failing to object to allegedly inadmissible hearsay testimony regarding the general location in which a gun tied to the shooting was found, and (3) failing to object to and move for a mistrial based on the prosecutor's allegedly improper closing arguments. (Filing 8-16 at CM/ECF pp. 4-36.) He also claimed that the cumulative effect of these alleged errors denied him effective assistance of counsel. (Filing 8-16 at CM/ECF p. 36.) Taylor requested an evidentiary hearing, appointment of postconviction counsel, and relief including reversal of his convictions and vacation of his sentences. (Filing 8-16 at CM/ECF p. 2.)

In a written order filed August 31, 2017, the state district court rejected each of Taylor's claims. (Filing 8-16 at CM/ECF pp. 38-49.) The court overruled Taylor's motion for postconviction relief, denied his request for an evidentiary hearing, and denied his request for appointment of counsel. (Filing 8-16 at CM/ECF pp. 48-49.)

Taylor appealed to the Nebraska Supreme Court, assigning that the state district court erred when it found each of his claims to be without merit and overruled his motion for postconviction relief without an evidentiary hearing. (Filing 8-3; Filing 8-11.) He also claimed that the state district court erred when it refused to appoint postconviction counsel. (Filing 8-11.)

In a published opinion filed July 27, 2018, the Nebraska Supreme Court affirmed the state district court's order overruling Taylor's motion for postconviction relief without an evidentiary hearing and without appointing counsel. (Filing 8-6.) In denying the ineffective assistance of counsel claims, the Nebraska Supreme Court correctly stated the deficient performance and prejudice prongs of the *Strickland v. Washington*, 466 U.S. 668 (1984), standard as the applicable legal standard. (Filing 8-6 at CM/ECF pp. 5-6.) The specific allegations of the claims and the Nebraska Supreme Court's disposition of each is set forth in the analysis below. Taylor filed a motion for rehearing, which was overruled. (Filing 8-3 at CM/ECF p. 5.) Taylor filed a petition for writ of certiorari with the United States Supreme Court,

which was denied on February 25, 2019. *Taylor v. Nebraska*, 139 S. Ct. 1270 (2019). (*See also* Filing 8-3 at CM/ECF p. 4.) The mandate was issued by the Nebraska Supreme Court on March 11, 2019. (Filing 8-3 at CM/ECF p. 5.)

## D.  Habeas Petition

Taylor filed his Petition for Writ of Habeas Corpus in this court on October 10, 2019. (Filing 1.) In response to the Petition, Respondent filed an Answer (filing 9), a Brief (filing 10), and the relevant state court records (filing 8). Taylor filed a brief (filing 12) in response to Respondent's Answer, and Respondent filed a reply brief (filing 14). This matter is fully submitted for disposition.

## III.  OVERVIEW OF APPLICABLE LAW

Three strands of federal habeas law intertwine in this case. They are (1) exhaustion and procedural default; (2) the deference that is owed to the state courts when a federal court reviews the factual or legal conclusions set forth in an opinion of a state court; and (3) the standard for evaluating a claim of ineffective assistance of counsel. The court elaborates upon those concepts next so that it may apply them later in a summary fashion as it reviews Taylor's claims.

## A.  Exhaustion and Procedural Default

As set forth in 28 U.S.C. § 2254:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented to the trial court, and then in an appeal to either the Nebraska Supreme Court directly[2] or to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation omitted). Although the language need not be identical, "[p]resenting a claim that is

---

[2] Where a life sentence has been imposed in a criminal case, the appeal goes directly to the Nebraska Supreme Court. Neb. Rev. Stat. § 24-1106.

9

merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## B. Deferential Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that

contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Id.* at 405-06. Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA [Antiterrorism and Effective Death Penalty Act] standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id.* at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

## C.  The Especially Deferential *Strickland* Standard

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for petitioners to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Further, as set forth in *Strickland*, counsel's

12

"strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

*Strickland* applies equally to appellate counsel, and appellate counsel is entitled to the "benefit of the doubt." *Woods v. Etherton*, ___ U.S. ___, ___, 136 S. Ct. 1149, 1153 (2016) (a "fairminded jurist" could have concluded that repetition of anonymous tip in state-court cocaine-possession trial did not establish that the uncontested facts it conveyed were submitted for their truth, in violation of the Confrontation Clause, or that petitioner was prejudiced by its admission into evidence, precluding federal habeas relief under the AEDPA; petitioner could not establish that petitioner's appellate counsel was ineffective, as appellate counsel was entitled to the "benefit of the doubt"). To demonstrate prejudice on account of appellate counsel's failure to raise a claim on appeal, a petitioner must show a "reasonable probability that an appeal of [the] issue would have been successful and that the result of the appeal would thereby have been different." *Pryor v. Norris*, 103 F.3d 710, 714 (8th Cir. 1997).

13

# IV.  DISCUSSION

## A.  Claim One

In Claim One, Taylor argues that he received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments when counsel failed to raise Fourth Amendment objections to evidence and testimony obtained from an unconstitutional detention and arrest to preserve the question of admissibility for appeal. (Filing 1 at CM/ECF pp. 16-17.) Taylor raised Claim One in his postconviction motion and appeal, and the Nebraska Supreme Court addressed and rejected the claim as follows:

> Taylor's first claim was that counsel was ineffective for failing to object to the admission of evidence obtained from an allegedly unconstitutional detention and arrest. Taylor noted that prior to his first trial, counsel had filed a motion to suppress evidence obtained as a result of his detention and arrest, which he alleged were made without reasonable suspicion or probable cause. Taylor's motion was successful in part. The court determined that statements made by Taylor should be suppressed because he was interrogated before he was read his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed. 2d 694 (1966). The court also determined that a DNA sample should be suppressed because Taylor was coerced into giving the sample. However, the court denied the remainder of the motion to suppress because it found that the detention and arrest were not unconstitutional.
>
> The facts related to Taylor's detention and arrest were generally as follows: A witness saw two men shooting into a vehicle in which the victim, Gaines, was seated. The witness described one of the shooters as wearing a brown shirt. Police officers who arrived on the scene of the shooting broadcast a description of a white vehicle that was believed to have been connected with the suspects. Officer Joel Strominger heard the broadcast and was in the vicinity of the shooting when he saw a vehicle that matched the description in the broadcast. Strominger observed a man standing near the passenger side of the vehicle who appeared to have exited the vehicle. The man was holding something brown in his hand. When the vehicle and the man departed in opposite

directions, Strominger followed the vehicle. He radioed a description of the man and the direction the man was heading to other officers.

Officer Jarvis Duncan heard Strominger's description and was traveling in the direction that Strominger had said the man was going. Duncan saw a man, Taylor, who fit the description given by Strominger. When Duncan and his partner pulled their cruiser up next to Taylor, Taylor started running. Duncan and his partner chased after Taylor and ordered him to stop, but he kept running. They caught up to Taylor at the front door of a house. Before the officers apprehended Taylor, they saw him throw something behind a tree in the front yard of the house. Duncan later found a brown shirt by the tree. At trial, a witness to the shooting identified the brown shirt found under the tree as the shirt worn by one of the shooters. Duncan and his partner handcuffed Taylor and placed him inside their cruiser. The officers took Taylor to Strominger, who was nearby. Strominger identified Taylor as the man he had seen earlier beside the vehicle.

Taylor claimed in his postconviction motion that trial counsel failed to properly object at trial to the admission of evidence that was obtained as a result of his arrest and, thus, failed to preserve for appeal the issue of the constitutionality of his arrest. He asserted that counsel either did not object to such evidence or that counsel's objection was inadequate because counsel objected on bases other than the constitutionality of his detention and arrest. Taylor's allegations in support of this claim focused on the brown shirt, which was received into evidence, and testimony by witnesses who identified one of the shooters as wearing a brown shirt.

The postconviction district court rejected Taylor's first postconviction claim. The district court reasoned in part that the trial court had reviewed Duncan's actions in stopping and arresting Taylor and had "ruled Officer Duncan's actions to be legal" and that therefore, the stop and arrest were not unconstitutional.

We have reviewed the trial court's ruling on Taylor's motion to suppress. We determine that even if trial counsel had challenged the constitutionality of the detention and arrest on appeal, the ruling would have been affirmed. In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an

15

appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination. *State v. Botts*, 299 Neb. 806, 910 N.W.2d 779 (2018). Based on the evidence presented by the State at the hearing on Taylor's motion to suppress, we agree with the district court's conclusion that the detention and arrest of Taylor did not violate the Fourth Amendment. Therefore, no evidence obtained as a result of Taylor's arrest or detention should have been suppressed based on an illegal search or seizure.

Because the trial court's ruling on the motion to suppress was correct, we conclude that Taylor has not shown prejudice resulting from trial counsel's failure to object at trial to evidence obtained as a result of his detention and arrest. Even if such objection had been made, it would properly have been overruled, and even if the issue had been preserved and raised on appeal, it would not have resulted in a reversal of Taylor's conviction. See *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017) (counsel not ineffective for failing to renew motion to suppress at trial when motion raised meritless argument). We therefore conclude that the district court did not err when it rejected Taylor's first postconviction claim without an evidentiary hearing.

(Filing 8-6 at CM/ECF pp. 6-7.)

The court has reviewed the transcript of the suppression hearing, as well as the trial court's decision denying the suppression motion, and the Nebraska Supreme Court's decision affirming the trial court's determination. (*See* Filing 8-17 at CM/ECF pp. 15-103; Filing 8-14 at CM/ECF pp. 16-28.) Upon such review, there is sufficient evidence in the record, which has not been rebutted by clear and convincing evidence, to support the state courts' findings that in the absence of a warrant, probable cause existed for Taylor's detention and arrest, such that no Fourth Amendment violation occurred. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964) (an officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense); *Carroll v. United States*, 267 U.S. 132, 162 (1925)

(probable cause exists where "the facts and circumstances within [the officers'] knowledge . . . [are] sufficient in themselves to warrant a man of reasonable caution in the belief" that an offense has been committed); *Royster v. Nichols*, 698 F.3d 681, 687-88 (8th Cir. 2012) ("An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense."); *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 817 (8th Cir. 2010) (courts consider the totality of circumstances based on the information available to officers at the time of the arrest, "giving [officers] substantial latitude in interpreting and drawing inferences from factual circumstances"). Specifically, the evidence supports the state courts' findings that, under the totality of the circumstances, Officer Duncan had a reasonable suspicion that Taylor may have been involved in criminal activity. Upon finding the Fourth Amendment claim lacked merit, the Nebraska Supreme Court reasonably determined that any objection or appeal based on Fourth Amendment grounds would have been futile, and thus, trial counsel's performance did not prejudice Taylor's defense. *See Kimmelman v. Morrison*, 477 U.S. 365, 374, 375 (1986) ("[w]hen defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the [petitioner] must also prove that his Fourth Amendment claim" has merit); *Strickland*, 466 U.S. at 689 (counsel is not required to make futile objections). The court finds nothing to indicate that the Nebraska Supreme Court's ruling was based on an unreasonable determination of the facts in light of the evidence or was contrary to, or involved an unreasonable application of, clearly established federal law. Thus, Claim One is denied.

## B.  Claim Two

Taylor asserts in Claim Two that he received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments when counsel failed to object to all inadmissible hearsay testimony regarding the general location where the gun used in the homicide was found and failed to raise at trial and on direct appeal the fact that this testimony violated his Sixth Amendment right to confrontation. (Filing 1 at CM/ECF pp. 18-19.) Taylor raised Claim Two in his postconviction motion and

17

appeal, and the Nebraska Supreme Court addressed and rejected the claim as follows:

> Taylor's second claim was that counsel was ineffective for failing to object to allegedly inadmissible hearsay testimony regarding the general location in which a gun tied to the shooting was found. In *Taylor II*, Taylor claimed that the trial court erred when it overruled his objection based on hearsay to testimony regarding the specific location in which the gun was found. We rejected the claim in *Taylor II*, in part because it was cumulative of prior testimony, to which Taylor did not object, regarding the general location in which the gun was found. In this postconviction claim, Taylor asserts counsel was ineffective for failing to object to the testimony regarding the general location. In effect, the claim is that trial counsel was deficient when he failed to object sooner.

> Joseph Copeland was a witness called by the State. Copeland lived near where the shooting occurred, and he testified that at the time of the shooting, just after he heard gunfire, he saw a man running down his street. Copeland further testified that approximately 2 months after the shooting, he called police to his residence because his son and a neighbor boy had found a gun "in the trees" when they were looking for an airplane they had lost when they "were playing down at the school." Copeland testified that his son had brought the gun to him and that his son had shown him where he found the gun.

> When the State asked Copeland to indicate on a map the location where his son had said he had found the gun, Taylor's counsel objected based on hearsay and the court sustained the objection. The State then asked Copeland whether he "physically went to that location," and Copeland responded, "Yes." The State again asked Copeland to identify the location on the map, and this time the court overruled Taylor's counsel's objection and allowed Copeland to identify the exact location.

> On appeal in *Taylor II*, the State conceded that Copeland's testimony regarding the exact location of the gun was inadmissible hearsay, but it argued that admission of the testimony was harmless error. We agreed that the testimony was inadmissible hearsay and that the error was

18

harmless. We reasoned that Copeland's testimony regarding the precise location of the gun was cumulative of earlier testimony by Copeland to which Taylor had not objected. We noted that Copeland had already testified without objection that his son had found the gun in the trees at the school. We also noted that Copeland's earlier testimony had indicated that he lived near the school. We reasoned that this evidence, admitted without objection, already established that the gun was found near Copeland's home. We further reasoned that the precise location of the gun "was not vital to the State's case" and instead that "[t]he important fact was that the gun was found near Copeland's home, in the area where Copeland had seen someone running the day of the shooting." *Taylor II*, 287 Neb. at 394, 842 N.W.2d at 778. We concluded that "[b]ecause evidence of the general location of the gun was received without objection, the subsequent hearsay [regarding the exact location] was cumulative." *Id.* We additionally reasoned that "there was a substantial amount of other evidence that established Taylor's guilt." *Id.*

Taylor claimed in his postconviction motion that trial counsel was ineffective for failing to object based on hearsay as soon as Copeland mentioned the gun and the general location in which it was found. He argued that counsel knew from prior proceedings the nature of Copeland's testimony and should have known where the testimony was going. He further argued that the error in admitting the evidence was not harmless because other evidence that we relied on in *Taylor II* to support his conviction was also improperly admitted.

In its written order, the district court rejected Taylor's second postconviction claim. The court noted that in *Taylor II*, we had found the error in admitting hearsay testimony regarding the exact location of the gun was harmless not only because it was cumulative of earlier testimony regarding the general location of the gun, but also "more significantly" because there was a substantial amount of other evidence that supported Taylor's conviction. The court stated that it was apparent that "even if the Copeland testimony was completely disregarded the record contained sufficient evidence to support . . . Taylor's conviction."

Taylor claims in this appeal that the postconviction district court erred in its legal analysis when it relied on our decision in *Taylor II* that

19

admission of hearsay testimony regarding the location of the gun was harmless error because of the substantial amount of other evidence that support Taylor's conviction. He argues that much of the other evidence on which we relied in reaching our determination in *Taylor II* was also inadmissible because it was obtained as the result of his detention and arrest. However, as we discussed above, the trial court did not err when it determined that Taylor's detention and arrest were not unconstitutional. Therefore, the other evidence upon which we relied in *Taylor II* was not improper based on a claim of illegal detention and arrest and it did support our conclusion in *Taylor II* that error in admitting hearsay regarding the specific location in which the gun was found was harmless error.

In contrast to our analytical framework in the direct appeal, *Taylor II*, we note that in this postconviction action the operative question is not whether error in admitting the evidence was harmless error. Instead, with regard to Taylor's claim of ineffective assistance of counsel, the court must determine whether counsel's alleged deficient performance caused prejudice to the defendant. To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. Vela*, 297 Neb. 227, 900 N.W.2d 8 (2017). This is a different standard from the harmless error analysis in *Taylor II*, which required us to find that Taylor's conviction was surely unattributable to the error in admitting hearsay evidence of the specific location of the gun.

In this postconviction action, the operative question is whether there is a reasonable probability that but for counsel's failure to object to Copeland's testimony regarding the general location of the gun the result of the proceeding would have been different. In other words, we must determine whether, if counsel had objected and the testimony had been excluded, there is a reasonable probability that Taylor would not have been convicted. We determine that because there was sufficient other evidence of Taylor's guilt, the admission of Copeland's unchallenged testimony regarding the location of the gun does not undermine confidence in the outcome of the trial and there was not a reasonable probability that the result of the trial would have been different if the testimony had been excluded. We conclude that the

20

district court did not err when it rejected Taylor's second postconviction claim without an evidentiary hearing.

(Filing 8-6 at CM/ECF pp. 7-9.)

The court finds that the Nebraska Supreme Court reasonably applied *Strickland*'s prejudice prong in concluding that trial counsel's failure to object to testimony regarding the general location of the gun did not constitute ineffective assistance. Specifically, the Nebraska Supreme Court reasonably determined that there was not a reasonable probability that the result of the trial would have been different if Copeland's unchallenged testimony regarding the general location of the gun had been excluded because there was sufficient other evidence of Taylor's guilt, which was set forth in the Nebraska Supreme Court's opinion in *Taylor II*. That evidence included:

> Hobson, Fortenberry, and Lade testified that they saw someone matching Taylor's description in the area at the time of the shooting. Lade identified Taylor at trial. She also testified that on the day of the shooting, Taylor walked immediately in front of her as she pulled into her driveway. She heard him talking on his cell phone saying, "[W]here you at? Where you at? Come get me. I'm on 42nd." She testified that he then hid behind some bushes and that she heard Taylor say, "[C]ome get me" into his cell phone. Cell phone records indicated multiple calls between Taylor's telephone number and Nolan's telephone number around the time of the shooting. Convenience store surveillance video footage also placed Taylor with Nolan and Kercheval before the shooting occurred.

> Taylor was apprehended shortly after the shooting, just several blocks away. At that time, Strominger identified Taylor as the individual he saw near the white vehicle Kercheval was driving, which vehicle fit the description of the vehicle suspected to be involved in the shooting. Taylor's fingerprints were also found on a cup in the vehicle Kercheval was driving.

> Shortly before being apprehended by police, Taylor discarded a brown shirt. Bryson, the eyewitness to the shooting, identified the shirt

discarded by Taylor as the shirt worn by the shooter. Material found on Taylor's hands was identified as possibly coming from a firearm.

([Filing 8-5 at CM/ECF p. 5](#).)

The court finds nothing to indicate that the Nebraska Supreme Court's ruling was based on an unreasonable determination of the facts in light of the evidence or was contrary to, or involved an unreasonable application of, clearly established federal law. Accordingly, Claim Two is denied.

## C. Claim Three

In Claim Three, Taylor complains that he received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments when counsel failed to object to and move for a mistrial based on the prosecutor's improper closing arguments and failed to assert the issue on direct appeal as plain error. ([Filing 1 at CM/ECF pp. 20-22](#).) Taylor raised Claim Three in his postconviction motion and appeal, and the Nebraska Supreme Court addressed and rejected the claim as follows:

> Taylor's third claim was that counsel was ineffective for failing to object to and move for a mistrial based on allegedly improper closing arguments made by the prosecutor. Taylor identified five occurrences from the prosecutor's closing arguments that he claimed were improper.
>
> In the first occurrence, the prosecutor referred to evidence that Taylor was riding in a car with a codefendant and told the jury, "you use your own common sense. There's conversation going on in that car." The prosecutor later stated, "We don't have evidence of what happened in that car, but use your common sense, the discussion that took place before they get out of the car." Taylor argued these comments were improper because the prosecutor was "inject[ing] her personal belief which was unsupported by the evidence more than once."

In the second occurrence, the prosecutor referred to Copeland's testimony and stated, "Copeland sees him on this block right here . . . . [Copeland] testified that he saw the defendant cut across right here . . . towards Mary Street where the gun's found." Taylor argued that these comments misstated the evidence because Copeland testified only that he saw a "black male" running down the street and that Copeland gave no further description and he never identified Taylor as the person he had seen.

In the third occurrence, the prosecutor stated, "[Taylor] had just run through the neighborhood with that brown shirt holding this gun . . . in his shorts." Taylor argued this comment was not supported by the evidence, because no witness testified to seeing Taylor holding a gun as he ran through the neighborhood.

In the fourth occurrence, the prosecutor referred to Taylor's codefendant, who testified at Taylor's trial and stated:

> What [the codefendant] testified to is the truth. Did he tell you everything? No. He's not telling you everything because he's friends with [Taylor] . . . . He doesn't want to give everything up, what he is telling you is the truth, because it's corroborated throughout the testimony and evidence of all the other witnesses.

The prosecutor stated in rebuttal:

> [Defense counsel] wants you to say that we called [the codefendant] a liar. We didn't call him a liar. He told you the truth. Everything he told you is corroborated. . . .

> What he did tell you is the truth. And it's corroborated by every other piece of evidence you have in this case . . . .

Taylor argued that the prosecutor was improperly vouching for its main witness.

In the fifth occurrence, the prosecutor referred to a witness who had seen the shooting and stated that she

23

came in here and she told you who she identified. Didn't get a good look at either one of their faces, but think about it, use your common sense. If you're standing there, you're going through what [the witness] went through, are you going to remember a visual face or are you going to remember—is clothing going to stand out more? Is a brown shirt with orange writing, are you going to forget that?

Taylor argued that this comment was improper because it asked the jurors to put themselves in the shoes of the witness and it therefore encouraged the jurors to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on evidence.

The district court rejected Taylor's third postconviction claim. The court stated, "Having reviewed the record it is clear to this Court that the prosecution did not engage in prosecutorial misconduct as any statements made by the prosecutor that may have been inaccurate did not mislead and unduly influence the jury. The prosecutor was merely making her closing argument to the jury." The court further stated that the prosecutor's comments "were reasonably drawn inferences from the evidence" and that trial counsel had "used his opportunity, during his closing argument to contest and/or discredit" the prosecutor's comments.

Determining whether defense counsel was ineffective in failing to object to prosecutorial misconduct requires an appellate court to first determine whether the petitioner has alleged any action or remarks that constituted prosecutorial misconduct. *State v. Ely*, 295 Neb. 607, 889 N.W.2d 377 (2017). A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct. *Id.* A prosecutor is entitled to draw inferences from the evidence in presenting his or her case, and such inferences generally do not amount to prosecutorial misconduct. *Id.* We determine that the first, second and third occurrences described above were instances of the prosecutor's drawing inferences from the evidence in making her arguments to the jury and did not amount to prosecutorial misconduct.

Regarding the fourth occurrence, Taylor argues that the prosecutor was improperly vouching for the witness. However, we do not read the

24

prosecutor's comments as vouching for the truth of the witness' testimony. The prosecutor was not asserting that she had personal knowledge of the witness' veracity. Instead, the prosecutor was pointing out that the testimony was corroborated by other evidence, and therefore, the prosecutor was drawing the inference that the witness' testimony was credible because it was consistent with other evidence. This argument did not amount to prosecutorial misconduct. See *State v. Gonzales*, 294 Neb. 627, 884 N.W.2d 102 (2016) (stating that while prosecutor should not express his or her personal belief or opinion as to truth or falsity of any testimony, when prosecutor's comments rest on reasonably drawn inferences from evidence, prosecutor is permitted to highlight relative believability of witnesses).

Regarding the fifth occurrence, Taylor contends that the prosecutor improperly asked the jurors to put themselves in the shoes of the witness and base their verdict on personal interest or bias. In his motion for postconviction relief, Taylor cited *Forrestal v. Magendantz*, 848 F.2d 303, 309 (1st Cir. 1988), for the proposition that it is improper for an attorney to make a "so-called Golden Rule argument" which encourages the jury to put itself in the shoes of a plaintiff and which encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence. However, the prosecutor's comments in this case were significantly different from this sort of argument. Instead, the prosecutor used inferences from the evidence to explain why the witness may have remembered certain details but not remembered other details of the suspects' appearances. The prosecutor did not ask the jurors to put themselves in the shoes of a party or in the shoes of the victim and to therefore render a verdict based on personal interest or bias. Instead, the prosecutor asked the jurors to consider how the circumstances may have affected the witness' observations and recollections. These comments did not constitute misconduct.

Because none of the occurrences urged by Taylor constituted prosecutorial misconduct, the district court did not err when it rejected Taylor's third claim of ineffective assistance of counsel.

(Filing 8-6 at CM/ECF pp. 9-11.)

"A prosecutor must limit the closing argument to the evidence and the reasonable inferences that may be drawn from it." *United States v. Eagle*, 515 F.3d 794, 805 (8th Cir. 2008). The prosecutor is entitled to rebut defense attacks on witness credibility. *United States v. Collins*, 642 F.3d 654, 657 (8th Cir. 2011). However, "[i]mproper vouching occurs when a prosecutor refers to facts outside the record, implies that the witness's testimony is supported by facts not available to the jury, gives an implied guarantee of truthfulness, or expresses a personal opinion regarding witness credibility." *United States v. Beaman*, 361 F.3d 1061, 1065 (8th Cir. 2004). In addition, "[a] so-called 'golden rule' argument which asks the jurors to place themselves in the position of a party 'is universally condemned because it encourages the jury to 'depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.'" *United States v. Palma*, 473 F.3d 899, 902 (8th Cir. 2007) (citations omitted).

Importantly, when comments made during a prosecutor's closing argument are not objectionable, they are not a basis for an ineffective assistance of counsel claim. *Epps v. State*, 901 F.2d 1481, 1483 (8th Cir. 1990); *see also Williams v. Lockhart*, 797 F.2d 344, 347 (8th Cir. 1986) (rejecting an ineffective assistance of trial counsel claim in relevant part because the prosecutor's closing argument was not improper).

Here, the Nebraska Supreme Court determined that there was no error in the prosecutor's comments and therefore rejected Taylor's claim that trial counsel was ineffective for failing to object to them. Upon review of the record, the court concludes that this ruling by the Nebraska Supreme Court was not factually unreasonable, nor did it involve a misapplication of *Strickland* or any other federal law. In each of the statements identified by Taylor, the prosecutor was drawing reasonable inferences from the evidence and/or emphasizing the plausibility of a State witness's testimony because such testimony was corroborated by other evidence. Because the portions of the prosecutor's closing argument challenged by Taylor were not objectionable, the failure of trial counsel to object to those statements does not constitute the ineffective assistance of counsel. The decision of

26

the Nebraska Supreme Court rejecting this ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, clearly established federal law. *See Kinder v. Bowersox*, 272 F.3d 532, 554 (8th Cir. 2001) (noting the state court reasonably applied *Strickland* in deciding that it was not "objectively unreasonable for counsel to fail to object to" a prosecutor's closing argument that had not been found improper). Furthermore, because there was no merit to Taylor's prosecutorial misconduct claims, counsel's failure to raise the claims on appeal cannot constitute ineffective assistance of counsel. *See Garrett v. United States*, 78 F.3d 1296, 1305 (8th Cir. 1996) ("It is true that if there is no merit to a claim, failure to raise it on appeal does not result in ineffective assistance under *Strickland*."). Accordingly, Taylor is not entitled to habeas relief on Claim Three.

## D.  Claim Four

In Claim Four, Taylor contends that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the cumulative effect of his counsel's deficient performance resulted in an unfair trial. (Filing 1 at CM/ECF p. 22.) On postconviction appeal, the Nebraska Supreme Court rejected this argument, explaining that, because none of Taylor's individual claims of ineffective assistance of counsel had merit, "the cumulative effect of such claims did not result in an unfair trial" and did "not merit postconviction relief." (Filing 8-6 at CM/ECF p. 11 (citing *State v. Robinson*, 843 N.W.2d 672 (Neb. 2014).)

The Eighth Circuit has made clear that "cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own." *Girtman v. Lockhart*, 942 F.2d 468, 475 (8th Cir. 1991) (quoting *Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir. 1990)); *see also Middleton v. Roper*, 455 F.3d 838 (8th Cir. 2006). As such, the court finds that the *Strickland* standard does not demand a cumulative performance inquiry. *See Forrest v. Steele*, 764 F.3d 848, 860 (8th Cir. 2014) (Supreme Court precedent does not obligate courts "to bundle individual claims of attorney error and determine whether the body of these alleged faults, en masse, overcome *Strickland*'s presumption of reasonableness"); *see also Wainwright v.*

*Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Errors that are not unconstitutional individually cannot be added together to create a constitutional violation. Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief." (internal citation omitted)). No Supreme Court decision "purport[s] to aggregate each discrete and potentially unrelated claim of ineffectiveness into a single performance inquiry." *Forrest*, 764 F.3d at 861. Rather, "'[a] fair assessment of attorney performance requires that every effort be made . . . to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time'" of each decision. *Id.* (quoting *Strickland*, 466 at 689).

Here, the Nebraska Supreme Court reasonably applied *Strickland* by analyzing individually each of the discrete ineffective assistance of counsel claims raised by Taylor and considering those circumstances appearing relevant to each claim. *See id.* In addition, given the absence of Supreme Court precedent applying the cumulative error doctrine to claims of ineffective assistance of counsel, and the fact that none of Taylor's individual claims have merit, the court cannot say that the Nebraska Supreme Court's rejection of Taylor's cumulative error claim was contrary to, or an unreasonable application of, clearly established federal law. *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established federal law."); *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007) (The Arizona Supreme Court did not unreasonably apply federal law because "we have never addressed a situation like this.") Nonetheless, even if a cumulative error review is appropriate, relief is not justified because the sum of no prejudice at all from any of the alleged errors is no prejudice at all in the aggregate. Accordingly, Taylor is not entitled to federal habeas relief on Claim Four.

**E. Claim Five**

Taylor argues in Claim Five that his rights under the Fifth and Fourteenth Amendments were violated when the trial court allowed the State to present hearsay testimony by Joseph Copeland about where a gun used in the homicide was located over Taylor's objections. (Filing 1 at CM/ECF p. 23.)

Taylor did not raise a federal constitutional claim regarding the hearsay testimony in the Nebraska Supreme Court. Rather, on direct appeal in *Taylor II*, Taylor relied solely on state law evidentiary grounds, and unsurprisingly, the Nebraska Supreme Court resolved the issue on state law grounds. (*See* Filing 8-7 at CM/ECF pp. 6, 14-16; Filing 8-5 at CM/ECF pp. 4-5.) Taylor did not specifically assert a violation of his Fifth and Fourteenth Amendment rights, refer to the Fifth and Fourteenth Amendments of the United States Constitution, or cite a relevant federal constitutional case or a state case raising a pertinent federal constitutional issue. *See Carney*, 487 F.3d at 1096. Fair presentation of a federal constitutional claim requires the petitioner to make the federal basis of the claim explicit to the state court, either by citing federal law or decisions of federal courts. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."). Taylor cited exclusively to state statutes, state evidentiary rules, and state court decisions; thus, he failed to adequately indicate that he was asserting a violation of his federal constitutional rights. *See Baldwin v. Reese*, 541 U.S. 27, 33 (2004) (holding that a petitioner's failure to identify a federal claim or to cite case law which might alert the state court to the federal nature of a claim is not fair presentation). Therefore, Taylor did not "fairly present" federal constitutional arguments with respect to the hearsay testimony in the Nebraska state courts as required by 28 U.S.C. § 2254(b)(1). Accordingly, Claim Five is procedurally defaulted, not unexhausted, because he cannot now present this claim to the Nebraska state courts.

In the alternative, the court finds that the claim is without merit. Under some circumstances, trial errors can amount to a denial of due process. As the court held in *Garcia v. Mathes*, 474 F.3d 1014 (8th Cir. 2007):

> In the habeas context, "[q]uestions regarding admissibility of evidence are matters of state law." *Rousan v. Roper*, 436 F.3d 951, 958 (8th Cir. 2006) (quotation omitted). "A federal issue is raised only where trial errors infringe on a specific constitutional protection or are so prejudicial as to amount to a denial of due process." *Bucklew v. Luebbers*, 436 F.3d 1010, 1018 (8th Cir. 2006). "The [applicant] must show that the alleged improprieties were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." *Rousan*, 436 F.3d at 958-59 (quotation omitted).

*Garcia*, 474 F.3d at 1017.

On direct appeal in *Taylor II*, the Nebraska Supreme Court determined that Copeland's statement concerning the exact location of the gun was hearsay and should not have been admitted, but that the error was harmless because "[t]he evidence was cumulative, and there was a substantial amount of other evidence that established Taylor's guilt." (Filing 8-5 at CM/ECF p. 5.) The court wrote:

> Taylor objected when Copeland was asked to identify the exact location where the gun was found. When the objection was overruled, Copeland stated that the gun was found in the bushes at 40th and Mary Streets about 6 feet from the street. But Copeland had already testified without objection that his son and a neighbor found the gun while looking for their lost airplane in the trees at the school. He also testified without objection that on the day of the shooting, there was a lot of traffic around the school, indicating that the school was close to his home. Thus, evidence admitted without objection showed the gun was found near Copeland's home.
>
> . . . . [T]he fact that the gun was located precisely at 40th and Mary Streets was not vital to the State's case. The important fact was that the gun was found near Copeland's home, in the area where Copeland had

seen someone running the day of the shooting. Evidence of that fact was admitted without objection.

Because evidence of the general location of the gun was received without objection, the subsequent hearsay was cumulative. . . .

(Filing 8-5 at CM/ECF p. 5.) The Nebraska Supreme Court further found that there was a substantial amount of other evidence that established Taylor's guilt, which the court previously discussed in detail in Claim Two. (Filing 8-5 at CM/ECF p. 5.) Taylor has failed to rebut the Nebraska Supreme Court's findings by clear and convincing evidence.

In light of the above, the court finds that Taylor has made no showing that trial was fundamentally unfair. The hearsay statement did not add anything substantial to the case that was not otherwise provided through other evidence and testimony, which supports the verdict. There is no reasonable probability that the admission of the hearsay statement affected the outcome of Taylor's trial.

## F.  Claim Six

Last, Taylor claims that his rights under the Fifth and Fourteenth Amendments were violated when the trial court allowed Officer Strominger to make an in-court identification that was the product of an unduly suggestive identification of Taylor made by Officer Strominger. Taylor raised Claim Six on direct appeal in *Taylor II*, and the Nebraska Supreme Court addressed and rejected the claim as follows:

Over Taylor's objection, the district court allowed Strominger to identify Taylor as the person he had seen next to the vehicle suspected to be involved in the shooting. Taylor claims the court erred in permitting this identification, because it was tainted by the circumstances surrounding Strominger's previous identification of Taylor. He contends that Strominger's identification on the day of the shooting was overly suggestive, because Taylor was taken to Strominger in handcuffs and because Strominger was told that Taylor had been arrested nearby and had discarded a brown shirt before his

arrest. He claims Strominger's identification also was undermined by Kercheval's testimony that Taylor left the white vehicle before the shooting and that Kercheval did not see Taylor again until long after the shooting.

Strominger's identification of Taylor was the result of a showup. A showup is usually defined as a one-on-one confrontation where the witness views only the suspect, and it is commonly conducted at the scene of the crime, shortly after the arrest or detention of a suspect and while the incident is still fresh in the witness' mind. *State v. Garcia*, 235 Neb. 53, 453 N.W.2d 469 (1990).

An identification procedure is constitutionally invalid only when it is so unnecessarily suggestive and conducive to an irreparably mistaken identification that a defendant is denied due process of law. *State v. Smith*, 269 Neb. 773, 696 N.W.2d 871 (2005). See, also, *Perry v. New Hampshire*, 565 U.S. 228, 132 S. Ct. 716, 181 L.Ed.2d 694 (2012). The admission of evidence of a showup does not, by itself, violate due process. See *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L.Ed.2d 401 (1972). A determination of impermissible suggestiveness is based on the totality of the circumstances. See *id.*

The U.S. Supreme Court has stated a two-part test for determining the admissibility of an out-of-court identification: "First, the trial court must decide whether the police used an unnecessarily suggestive identification procedure. . . . If they did, the court must next consider whether the improper identification procedure so tainted the resulting identification as to render it unreliable and therefore inadmissible." *Perry*, 565 U.S. at 235, 132 S. Ct. at 722.

Reliability is the linchpin in determining the admissibility of identification testimony. *State v. Faust*, 269 Neb. 749, 696 N.W.2d 420 (2005). We have stated:

> The factors to be considered [in determining the reliability of a witness' identification] include (1) the opportunity of the witness to view the alleged criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his or her prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the

time between the crime and the confrontation. . . . Against these factors is to be weighed the corrupting influence of the suggestive identification itself.

*Id.* at 757, 696 N.W.2d at 427 (citations omitted).

We previously considered the constitutionality of a one-on-one identification in *State v. Wickline*, 232 Neb. 329, 440 N.W.2d 249 (1989), *disapproved on other grounds*, *State v. Sanders*, 235 Neb. 183, 455 N.W.2d 108 (1990). In *Wickline*, 232 Neb. at 335, 440 N.W.2d at 253, we concluded that the identification of a defendant was not unduly suggestive where (1) the witness observed the defendant standing near a stolen vehicle and, a few minutes later, hiding behind a utility pole and (2) about 4 hours after initially observing the defendant, the same witness identified the defendant "without displaying or suggesting any uncertainty in her identification."

Strominger's identification of Taylor was made under circumstances comparable to those in *Wickline*, and we conclude that the identification of Taylor was not unduly suggestive or conducive to a mistaken identification. On the day of the shooting, Strominger observed a person outside a vehicle that may have been involved in the shooting. Within a matter of minutes, other police officers brought Taylor to Strominger's location. Strominger immediately identified Taylor as the person he had previously observed. Under these circumstances, Taylor was not denied due process of law. Strominger's identification was not unnecessarily suggestive or conducive to an irreparably mistaken identification.

Taylor emphasizes that he was handcuffed in the back of a police cruiser and that the officers who detained Taylor told Strominger that Taylor might be the person who ran from the white vehicle. But these facts do not render Strominger's identification unduly suggestive. Strominger was a police officer. His duties required him to identify suspects. As he was responding to a shooting, Strominger saw Taylor standing next to a vehicle that may have been involved in the shooting. Because Strominger thought Taylor also might have been involved in the shooting, Strominger provided a description of Taylor to other officers, who located Taylor based on that description. Then, during the initial minutes of the investigation, Strominger identified Taylor as the

person he had observed near the suspect vehicle. This procedure was
not unduly suggestive.

(Filing 8-5 at CM/ECF pp. 5-7.)

"[T]he admission of evidence of a showup without more does not violate due
process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). To determine whether an
identification violates a criminal defendant's due process rights, a court must first
determine whether the "law enforcement officers use[d] an identification procedure
that [was] both suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S.
228, 238-39 (2012) (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977); *Biggers*,
409 U.S. at 198). However, "[e]ven when the police use such a procedure . . .
suppression of the resulting identification is not the inevitable consequence." *Id.* The
court must apply a "totality of the circumstances" approach, on a case-by-case basis,
to determine "whether [the] improper police conduct created a 'substantial
likelihood of misidentification.'" *Id.* at 239 (quoting *Biggers*, 409 U.S. at 201). The
factors to be considered in determining the reliability of an identification include
whether there are indicia of reliability, such as the witness' opportunity to view the
participants in the crime and whether attention was paid; the accuracy of prior
descriptions of the accused; the level of certainty that the identifying party
demonstrates when confronted with the person who is identified; and the length of
time between the crime and the confrontation. *Manson*, 432 U.S. at 114.

The Nebraska Supreme Court cited and applied Supreme Court case law, and
its conclusion that Strominger's identification of Taylor was not unduly suggestive
or conducive to a mistaken identification was neither contrary to, nor an
unreasonable application of, clearly established federal law. Nor has Taylor
demonstrated that the Nebraska Supreme Court unreasonably determined the facts
governing the reliability of Strominger's identification of Taylor. Thus, Taylor is not
entitled to habeas corpus relief on Claim Six.

## V. CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). The court has applied the appropriate standard and determined that Taylor is not entitled to a certificate of appealability.

IT IS THERFORE ORDERED that the Petition for Writ of Habeas Corpus (filing 1) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. Judgment will be issued by separate document.

Dated this 12th day of February, 2021.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge